Good afternoon. The next case is Shah v. VHS San Antonio Partners. Ms. Wolford. Good afternoon, your honor. My name is... I apologize. Mr. Wolford. No problem at all, your honor. Good afternoon, and may it please the court. My name is Luke Wolford, and I'm privileged to appear before you today on behalf of the appellant, Dr. Jaydeep Shah. This case concerns a long-term exclusive dealing agreement that forecloses competition and creates a substantial barrier to entry in the highly concentrated market for pediatric anesthesiology services in and around San Antonio, TX. Contrary to Appley's arguments in the district court's decision below, this case is not merely about one doctor's exclusion from a single hospital system. In this lawsuit, Dr. Shah alleges that the exclusive dealing agreement between Baptist Star Anesthesia unreasonably restrains competition and tends to create a monopoly in the market for pediatric anesthesiology services in Bayer County and the seven contiguous counties. In addition, Dr. Shah alleges that the Baptist Star exclusive agreement constitutes an illegal tying arrangement whereby Baptist uses its power in the market for pediatric surgical facilities to force pediatric surgeons to accept anesthesia services that they otherwise would not want. Now, after initially denying Appley's motion to dismiss for failure to state a claim, the district court entered summary judgment for Appley's on two grounds. First, the district court held that Dr. Shah failed to define the relevant market as a matter of law. Second, the district court held that Dr. Shah failed to present any evidence of market-wide harm to competition. In addition, the district court opined that Dr. Shah was not a proper plaintiff to challenge the Baptist Star agreement, but it did not expressly grant summary judgment on this ground. This court should reverse the decision below because the district court fundamentally misconstrued Dr. Shah's claims, the district court erroneously refused to consider critical evidence of market-wide harm to competition, and the district court improperly resolved disputed issues of fact on which Dr. Shah presented substantial evidence. Now, to correctly understand Dr. Shah's claims, I think it's important to first understand the structure of the relevant market. In the San Antonio area, there are two dominant anesthesia groups that provide nearly all of the pediatric anesthesiology services in the market. These groups are Star Anesthesia and Tejas Anesthesia. In addition, there are three hospital systems that provide the lion's share of the pediatric surgical services in the market. These are Appley Baptist Health System, Christus Children's Hospital of San Antonio, and Methodist Children's Hospital. Now, significantly, Star Anesthesia has exclusive dealing agreements with both Baptist and Christus, and Tejas has an exclusive dealing agreement with Methodist. Thus, the market for pediatric anesthesiology services is controlled by two anesthesia groups that have divided the market between themselves via exclusive dealing agreements with the three dominant providers of pediatric surgical services. Now, Dr. Shah is a nationally renowned board-certified pediatric anesthesiologist who began practicing in San Antonio in 1999. From 2006 to 2016, Dr. Shah served in key leadership roles for both Baptist and Star Anesthesia, but when his affiliation with Star Anesthesia ended in a new anesthesia company and even obtained privileges to practice at Baptist. However, because of the exclusive agreement between Baptist and Star, Dr. Shah was never actually allowed to practice at Baptist, and because of the other exclusive dealing agreements that are pervasive in the market, there was not enough work outside of Baptist for Dr. Shah's new company to become viable in the market. Now, notably, Dr. Shah was not the only pediatric anesthesiologist who was effectively excluded from this market because of the Baptist-Star exclusive agreement. Indeed, Dr. Shah has presented evidence that multiple TAHAS pediatric anesthesiologists either resigned or significantly curtailed their practices because of the Star-Baptist exclusive. So again, this case is not merely about one doctor's exclusion from a single hospital system, it's about an exclusive dealing agreement that has significant anti-competitive effects throughout a highly concentrated market. Now, turning now to the relevant market definition, it's important to note that market definition is a question of fact. That summary judgment based on a plaintiff's failure to define the relevant market is only appropriate if the plaintiff fails to present any evidence from which a reasonable jury can find that the plaintiff's market definition is valid. Here, Dr. Shah presented more than enough evidence to support both his product and geographic market definitions, and the district court erred by resolving this issue of fact against him. Now, I'll first address the product market. A product market is defined by the interchangeability of the product and the cross-elasticity of demand. In layman's terms, a product market must include all reasonable substitutes that a consumer could turn to if a hypothetical monopolist raised the prices for the product above competitive levels. Although economic analysis of cross-elasticity of demand is the traditional way that plaintiffs define a product market, for more than 60 years, the Supreme Court has recognized that practical indicia such as industry, public, or consumer recognition of a distinct market can be sufficient. Here, Dr. Shah presented just that type of evidence. First, Dr. Shah presented evidence that Baptist's own privileging standards identify pediatric anesthesiology as a distinct subspecialty of anesthesiology that requires unique qualifications and training. Second, Dr. Shah presented evidence that the American College of Surgeons and other industry groups define pediatric anesthesiology as a specialty that requires unique qualifications and training. Third, Dr. Shah presented evidence that pediatric surgeons in this very market insist on using anesthesiologists that either specialize in pediatric anesthesiology or exclusively provide pediatric anesthesiology. Now, this evidence is critical because the pediatric surgeons are generally the person that selects the anesthesiologist, not the patient itself. So, in this way, the pediatric surgeons are the effective consumer of pediatric anesthesiology services, and this evidence clearly shows that those consumers do not view that they're reasonable substitutes for pediatric anesthesiology services. Finally, and most important, Appleby's own expert, Dr. Robert Maness, readily concedes that, quote, a relevant product market for pediatric anesthesiology services makes economic sense. All of this evidence is more than sufficient to survive summary judgment on the question of the relevant product market, and the district court erred in resolving this disputed fact issue against Dr. Shah. Then, moving to the second component of the market definition, the geographic market. The salient question for determining the geographic market is to try and determine the area of effective competition for the product or service at issue. In resolving this question, the focus is on where the providers of the product or service operate and where buyers of the product or service can practically go to obtain the product or service. Now, here, Dr. Shah proposed a relatively broad geographic market that includes Bayer County and the seven contiguous counties, and the district court concluded that Dr. Shah's proposed geographic market was invalid as a matter of law, even though this is a fact question, the court held it was invalid as a matter of law, because Dr. Shah, quote, proffered a definition of a market that revolves entirely around himself, a single competitor excluded from a single hospital system, and second, the district court held that Dr. Shah failed to present any evidence of where people can practically go to obtain pediatric anesthesiology services. Now, respectfully, the district court erred on both accounts. First, Dr. Shah did not restrain his relevant geographic market definition only to Baptist Health System. Rather, his proposed geographic market includes Bayer County and the seven contiguous counties. Second, the district court was simply wrong in concluding that Dr. Shah failed to present evidence as to where consumers of pediatric anesthesiology services can practically go to obtain those services. First, Dr. Shah presented evidence that the only pediatric anesthesiologists in the San Antonio area reside in Bayer County, and that the only pediatric intensive care unit and the only level three and level four neonatal intensive care units are located in Bayer County. Now, Applees say this evidence means nothing. Well, of course, of course, it is directly relevant to the geographic market definition because it shows where the consumers and the providers of pediatric anesthesiology services operate and are located. In other words, it shows the effective area of competition for pediatric anesthesiology services. Now, in addition, Dr. Shah presented evidence in a market study which found that, quote, than 2% of children leave San Antonio to seek care in Houston, Austin, or elsewhere, and that, quote, there is little out migration of area pediatric patients out of Bayer County to other metropolitan areas for care. Now, this evidence plainly addresses where people can and do practically go for pediatric surgical and anesthesiological services, and this evidence also supports Dr. Shah's geographic market definition. In addition, Dr. Shah pointed to another case against Baptist in which the very same market definition that he's proposed in this case was upheld with respect to the market for nursing services. Now, admittedly, this is not an Apples to Apples comparison, but it is some evidence from which a reasonable jury could conclude that the catchment area for medical services in general in the San Antonio market includes Bayer County and the seven contiguous counties. And taken together, all of this evidence was more than sufficient to survive summary judgment on the fact question of the relevant geographic market definition. Now, the district court also erred in concluding that Dr. Shah failed to present any evidence of market-wide harm to competition. It's important to note that, like market definition, the question of market-wide harm to competition is also a question of fact. In resolving this question against Dr. Shah, the district court again fundamentally misconstrued Dr. Shah's claims and erroneously refused to consider critical evidence that Dr. Shah presented regarding market-wide harm to competition. First, the district court misunderstood Dr. Shah's claims, again, to be only about harm to himself from being excluded from the Baptist health system. While Dr. Shah's claims certainly encompass his exclusion from Baptist, they're not nearly so In fact, as I've mentioned earlier, Dr. Shah presented evidence that he was not only excluded for Baptist, but that he and the new company that he formed were effectively excluded from the entire market. In addition, Dr. Shah presented evidence that multiple Tejas pediatric anesthesiologists either resigned or significantly curtailed their practices because of the Baptist STAR exclusive agreement. Now, this evidence indicates that the STAR-Baptist exclusive agreement foreclosed a significant share of the market. Before the agreement, the market supported these additional doctors. And although the demand in the market did not decrease, the exclusive agreement foreclosed enough competition to drive these doctors out of the market. This artificial reduction in output is a hallmark of the anti-competitive effect of the Baptist STAR exclusive agreement. Finally, market-wide harm to competition is also shown by the fact that the market for pediatric anesthesiology services is highly concentrated and divided between two dominant anesthesia groups through exclusive dealing agreements with the three dominant providers of pediatric surgical services. This type of highly concentrated market with prevalent exclusive dealing agreements makes it virtually impossible for any pediatric anesthesiologist to enter the market, much less remain and compete in the market. And all of this evidence of broad foreclosure of competition throughout the market is more than enough to survive summary judgment on the fact question of market-wide harm to competition and the district court erred in ruling otherwise. And the reason the district court erred, I think, primarily is the district court just erroneously refused to consider Dr. Shah's evidence of market-wide harm to competition. Indeed, the district court correctly stated that Dr. Shah needed to show harm beyond himself in order to show market-wide harm to competition. However, when Dr. Shah pointed to the evidence regarding the Tejas doctors who were also excluded effectively from the market, the district court said, I'm not going to consider that evidence because Dr. Shah lacks standing to bring new claims on behalf of the Tejas doctors. Well, Dr. Shah didn't present this evidence because he was seeking to present claims, you know, based on the exclusion of the Tejas doctors. He presented this evidence because he And the district court's refusal to consider this evidence was a significant fundamental error that fundamentally tainted the district court's analysis regarding market-wide harm to competition. In sum, the district court fundamentally misconstrued Dr. Shah's theory of market-wide harm to competition and erroneously refused to consider critical evidence of market-wide harm to competition. And this court should reverse the district court's decision for those reasons. Finally, although the district court didn't enter summary judgment on the grounds that Dr. Shah lacks antitrust standing, it did opine that he was not the proper plaintiff to challenge the Baptist Star exclusive agreement, and Applees urged this court to affirm on that basis. I would just point out that, again, in its antitrust standing analysis, the district court fundamentally misconstrued Dr. Shah's claims as only asserting harm of a reduction in consumer choice and a reduction in the quality of care in the market. But these are secondary harms. Okay, your time has expired. You've saved some time for rebuttal. Thank you, Your Honor. Ms. Johnson. Thank you, Your Honor. And if I may offer my condolences to Judge King. Thank you. May it please the court. The Sherman Act claims in this case center on a single doctor's complaint that after he was terminated by his group, he was no longer able to provide pediatric anesthesiology services in a single hospital system where his former group had an exclusive arrangement. But Dr. Shah presented no evidence that the contract between VHS and Star Anesthesia, a very common type of contract in the healthcare industry, harmed competition or harmed consumers in the relevant market. And as a result, the district court granted summary judgment for VHS ruling that Dr. Shah failed to present legally sufficient evidence defining a relevant market and failed to prove harm to that market. And we ask this court to affirm that ruling. And if I may just start with a with a brief statement about the district court opinion, because what you what you just heard quite a bit of is the district court refused to consider evidence, ignored evidence. And I would, of course, refer you to the very detailed 17 page opinion we have from the district court. There was no refusal to consider evidence. There was no ignoring evidence. The court very carefully and thoroughly went through all of the evidence that was presented in the summary judgment record. If I may start with the relevant market. And again, I want to start because I want to just make a clear point at the outset that in his reply brief, Dr. Shah seriously misstates the district court's ruling on the relevant product market in two ways. First, he says that the district court ruled that the relevant market was pediatric anesthesiologists. That's at page two. Now, he seems to have retreated from that position here at oral argument. But the definition of the market has been a bit of a moving target in this case. And the district court, he articulated it as pediatric anesthesiology services. In his briefs on appeal, it was pediatric anesthesiologists. It sounds like we're back to the services oriented market. And that, of course, is what was presented to the district court. But I would just point out that's a misstatement about the district court's ruling. The second misstatement in the reply brief is that he says that the district court did not find fault with the product market. That's at page two to three. That, again, of course, is not correct. The district court devoted four pages in its opinion to explaining why Dr. Shah's market definition was insufficient as a matter of law. What the court has heard as the relevant market definition sounds reasonable, pediatric anesthesiology services in San Antonio and seven contiguous counties. But here's the problem with that. It's not really the market he was measuring. And, of course, that was the basis for the district court's opinion. The reality of Dr. Shah's market is that he carves out huge segments of the pediatric anesthesiology market in San Antonio. And what's left and what his harm analysis is entirely based on is our services performed at six BHS hospitals, which comprise just nine percent of all pediatric anesthesiology services provided in the area in any given year. So what does he carve out? Well, he's very clear in his deposition testimony. It's all laid out in the briefs that he carves out the two of the biggest hospitals in San Antonio, the university and the military hospitals. He concedes that pediatric anesthesia services are provided at both of these hospitals, but he excludes them as from the source of supply because he says they are not hospitals where he and I refer the court to his deposition at 1076. He says the military hospital is excluded because it's not a place that I can work. And he and the university hospital excluded because, quote, you just can't get privileges and work there. I would point out there are no structural barriers to Dr. Shah working at these hospitals. There is a separate credentialing process, but no structural barriers. And in any event, where Dr. Shah chooses to work or obtain credentials is not a relevant market. A market must be defined in terms of consumers. Where can consumers in the San Antonio area turn for pediatric anesthesiology services, looking at all relevant sources of supply? And it's undisputed that Dr. Shah performed no analysis of that issue. The second carve out from Dr. Shah... Can I ask a question? Yes, you are. Who are the consumers of pediatric surgery services? Aren't they the hospitals that enter into contracts with them as distinguished from the customers of the hospitals? Your honor. No, your honor. The consumers of pediatric anesthesiology services are the patients, the pediatric patients. Now, let me ask you a question. I mean, have you ever had any experience getting surgery in a hospital? Have you ever been asked to identify who the anesthesiologist was? Did he ever... He appeared at the last minute, all gowned up. You had no idea who he was or who picked him. And you didn't have a vote. No one said, is it all right with you if we use Dr. So-and-so to give you your anesthesia? No one even mentioned that. So who are the consumers? I mean, it isn't the hospital's customers. That we know, because they're never asked. They don't sign anything. They don't agree. So who are the consumers? Well, your honor makes a great point. I mean, this is an unusual market in that the person who selects the anesthesiologist is the surgeon. And the patient selects the surgeon or selects the hospital where the surgeon practices. And then the surgeon really acts as an agent for the patient in selecting the ancillary services that come with that primary service. So ultimately, the customer is the patient. And I would refer the court to, obviously, the leading case on the nature of this relationship, which is the Jefferson Parish Hospital case. And they describe it there, which is that, yes, typically, the patient does not choose the anesthesiology, but a patient can go to any hospital or surgeon they want to. And in that way, they can choose their anesthesiology should they choose to. If they are sophisticated, that's the phrase that U.S. Supreme Court uses. If they are sophisticated and they want to choose an anesthesiologist, then they do that by choosing a surgeon. This doesn't happen. I mean, maybe in a perfect world where customers always have the final say, but it simply doesn't happen. Customers do not choose the anesthesiologist. As a practical matter, that is the way this market works. And how are we supposed to be looking at this, if not as a practical matter? Well, Your Honor, I think, you know, there's a couple ways the court can analyze the relevant market. I mean, in terms of how are we supposed to be looking at in terms of who is harmed by this, who is harmed by the alleged anti-competitive conduct? Well, the plaintiff has offered a couple options. One is surgeons are harmed because they don't have the choice of anesthesiologists. But then they go on to say that they concede that surgeons are not harmed in this case. And so, I think the plaintiff has set this up as patients. I mean, when they're showing harm to a market, they are at least attempting to show harm to patient care, the quality of the services offered and the quantity of the services offered. So, I don't think there's a dispute between the parties that the harm to the competition here has to be shown in terms of the patients. So, the other carve-out, just so you know that we're talking about relevant market, the other carve-out from this relevant market is pediatric services provided in non-hospital settings. Again, no dispute that pediatric anesthesiology services are provided in those non-hospital settings, but he carves them out. His only quote is that they cannot be compared to hospitals without any explanation of that. Very quickly on the geographic market, the problem here, your honors, is that he just simply offers no evidence that ties to the legal issue here, which is where can consumers practically turn to obtain pediatric anesthesiology services. And all of his evidence, it has to do with other markets, inpatient services. He mentions the allegations in another case that has to do with the market for the employment of nurses. You heard him say that's not an apples to apples comparison. I would say it's a little bit, the problem is a little more severe than that, because the market for the employment of nurses is entirely different than the market for a specialty like pediatric anesthesiology. In fact, the evidence in the record is that the geographic market for, say, a general medical service like nursing is quite different than the market for a specialty, because patients are willing to travel further to obtain a specialty service, and that would be certainly the case here. He gives a couple other kinds of evidence like the location of NICUs and PICUs, but again, none of this goes to the relevant legal issue, which is the willingness and ability of customers to identify and use physicians from other areas to provide pediatric anesthesiology services. I would point the court again. Other areas, are you talking about Houston, Dallas, what are you talking about? Yes, your honor, it could be, if there had been some kind of economic analysis performed in this case, which of course there was none, it could be that you would learn that pediatric patients are willing to travel further than these eight contiguous counties. We don't know the answer to that question, because no kind of quantitative or qualitative economic analysis of any kind was performed in this case. What we do know from the case law is that the hospital's service area, the trade area, where the business operates, where patients live, those are all some things you just heard, those do not factor into defining a relevant market, that you have to make, it has to be a consumer-based decision. And Justice King, or Judge King, I'm sorry, back to your question. The pediatric anesthesiology services market and the pediatric surgery market, the market for those would be the same. To your point, it's not that patients are out searching for a pediatric anesthesiologist, they are, however, searching for a surgeon. Yes, they are. And for a hospital. And for a hospital. And when they find that surgeon, what they're getting then is a complement of services that surround that surgical procedure. So they're getting a radiologist, they're getting a pathologist, they're getting an anesthesiologist. And that's why these kinds of contracts are so common in the healthcare industry, because hospitals want to ensure that they have reliable, high-quality ancillary services available to patients and to surgeons for all of this package of services that are necessary to the surgical proceeding. So one way that this could have been done, and of course, there was no economic analysis, but one way it could have been done was to analyze where do patients go for pediatric surgeries? Because that would be the same, my point being there's a primary market and an ancillary market, and those would be the same in this case. Let me move quickly. I thought he started statistics about only a certain percentage of people in this area leave the Bear Canyon surrounding area for pediatric surgery. I'm not sure I'm aware of that, of those statistics, Your Honor. There was no data-driven analysis in this case of consumer purchasing patterns for pediatric surgery. There were no, the types of evidence that you normally would see to prove a relevant market, no surveys revealing consumer preferences, none of the tests that are normally performed by economists to determine where patients plausibly turn to obtain these services. If I can move on to the issue of harm, because Dr. Shaw, let me just be clear, if you take his relevant market at face value and it's pediatric anesthesiology services in San Antonio and the seven contiguous counties, he doesn't even try to show harm to that market. He can't. All of his evidence in this case, whether it goes to the quantity, the quality, all of his evidence of harm relates to six VHS hospitals that comprise only 9% of the market. So how does he prove harm in this case? Well, he could have done it if he chose not to go the indirect route, which would have been showing market power and then evidence of challenge that the restraint harms competition. He performed no economic analysis of the market, presented no proof of VHS's market power, and in fact, has taken the position in this appeal that the market power is not a part of this case because it was not a part of phase one. So he has to show harm with direct evidence. And how do you do that? There's three categories of evidence you have to put on. Actual detrimental effects to consumers in terms of increased prices, reduced output, or decreased quality. But he produces no evidence of any of this. He concedes he didn't even look at no, this is, of course, the primary way that an antitrust plaintiff shows market-wide harm from any competitive conduct, no analysis of price in the relevant market here. When it comes to declining quantity of pediatric services, his briefing talks about two figures that he says, and you heard this, that not only he was excluded from the market, but these other anesthesiologists at Tejas were excluded from the market. But this is critical, Your Honor. They were not excluded from the market. At most, they have been excluded from the six VHS hospitals, which are 9% of the market. And this, because the STAR VHS agreement, and you heard about other exclusive agreements. I want to make this point too. Other exclusive agreements are not at issue in this case. And the STAR VHS agreement does not prevent Dr. Shah, nor does it prevent Tejas from practicing at the four other major hospital systems in San Antonio, Methodist, CHOSA, University, and the Military Hospital, as well as numerous non-hospital settings. And to be clear, Tejas anesthesiology is certainly not excluded. They are a very busy and a successful anesthesiology practice. They, in fact, have an exclusive arrangement with the largest provider of pediatric anesthesiology services in San Antonio, that's Methodist Hospital. The other thing you heard in the briefing is that certain pediatric anesthesiologists have resigned, but we don't know who they are. We don't know why they've resigned. We don't know if they're still practicing in the market or not. So the point is, none of these numbers are a substitute for what is the huge missing piece of plaintiff's case, which is some kind of economic analysis of the quality or quantity or availability of pediatric anesthesiology services in the relevant market. And there's certainly been no analysis of whether any decline was a result of an exclusive contract between BHS and STAR. In fact, the evidence in this summary judgment record shows that there were more pediatric anesthesiology services rendered after Dr. Shah's departure in December 2016. And I would refer the court to the record at page 1284. That is where Dr. Baldwin, who is the chief of pediatric surgery at North Central Baptist, says he performed more procedures per year with STAR anesthesiology in 2017 and 18 after Dr. Shah's departure than from 2012 to 2016. As for quality, the summary judgment record on this is really just a handful of anecdotal evidence from a handful of surgeons who used to work with Dr. Shah at North Central Baptist. And they say they had scheduling difficulties and they were not able to do surgeries with anesthesiologists who they had worked with. But here's the point about this evidence about quality, a decline in quality, is not just limited to one hospital system. It's primarily limited to one hospital, North Central Baptist. It is certainly not evidence of market wide harm. It's also limited in time. Dr. Shah left and certainly for a few months after that, there was a brief storm where there was scheduling difficulties. And all of the evidence of harm relates to about a three to six month period. Certainly nothing about a long-term harm over the 12 years that this contract had been in place. And here's the critical point. No evidence of adverse patient outcomes. No one said I was forced to perform a surgery with an unqualified anesthesiologist or there was some kind of adverse patient outcome. There's simply no evidence in this record of a permanent long-term reduction in quality or the availability for pediatric services. In some, your honor, there has been no attempt to show market-wide harm outside of Baptist health systems. And even if you're looking only at Baptist health systems only, even within that system, even looking at just one hospital in that system, there is no legally sufficient evidence of harm to patients through increased prices, reduced availability or reduced quality. And again, just as came to your question about how this market works, what's a hospital's incentive here? Well, it's entirely aligned with patients. Hospitals want surgeons to be happy and they want to have reliable, high quality care in terms of anesthesiology and other ancillary services. That's why these agreements are so common in the healthcare industry to ensure reliable, high quality care for patients. And if there are no other questions, sorry, I will close and ask that the court affirm the summary judgment. Thank you, Chief Judge Owen. And Judge King, one of my partners, just informed me about your loss and I do want to offer my condolences as well. I'm very sorry to hear about that. Thank you. In responding to Ms. Johnson's arguments, I've got a number of points that I want to address. First, Ms. Johnson said the district court didn't refuse to consider evidence of harm to competition, but the district court absolutely refused to consider the exclusion of Tejas, evidence regarding the exclusion of Tejas doctors from the market. It's at page seven, footnote seven of the district yes, detailed 17-page opinion. And in that footnote, the district court expressly says, Dr. Shah's allegations as to Tejas have no bearing on this lawsuit. Dr. Shah lacks standing to pursue claims on their behalf. Dr. Shah wasn't trying to pursue claims on behalf of these excluded Tejas doctors. He was showing evidence of their exclusion from the market to show market-wide harm to competition. Next, Ms. Johnson addressed another, a red herring that really confused the trial court with respect to the product market definition. Ms. Johnson addressed this issue of, well, Dr. Shah excludes certain facilities from his product market. Well, Dr. Shah didn't define his relevant product market based on the facilities where pediatric anesthesiology services are performed. Dr. Shah defined his market as pediatric anesthesiology services. And as I discussed earlier, there's plenty of evidence to show there are no reasonable substitutes for that product or service, which means it's a legitimate product market definition. Now, all this business about what facilities are included in the market, that really has nothing whatsoever to do with whether or not there are reasonable substitutes for pediatric anesthesiology services. To the extent that the facilities are relevant at all, it's relevant to Dr. Shah's tying allegation. Specifically, it relates to whether Baptist has market power in the tying product, which is pediatric surgical facilities. So what Applees essentially did was injected this issue by questioning Dr. Shah about it and then got the district court to find that Dr. Shah failed to define relevant product market for an exclusive dealing claim by referencing evidence that has nothing to do with the exclusive dealing claim, but only relates to the market for the tying product. So that was air and frankly Applees kind of led the district court down that erroneous path. Third, I want to address this notion of who are the consumers for pediatric anesthesiology services. Judge King, you are exactly right. The consumers of pediatric anesthesiology services are pediatric surgeons. As Judge King pointed out, no patient picks their anesthesiologist. It's the surgeon who picks the anesthesiologist. And so that's the prism through which we need to view these antitrust claims. I'm not sure whether it's the surgeon or whether it's the hospital. Now, the question about the relationship between the surgeons and the hospitals, that's a sort of root issue. So I don't know who in that, as between the two of them, picks the anesthesiologist. But it's either the hospital, probably informed by what the surgeons want. But the only thing I know is it's not the patient. Who has no say in the matter. Yes, I would certainly agree with that, Judge King. And I would respectfully submit that there is evidence in the record that the surgeons are the ones who actually select the specific pediatric anesthesiologists that they work with. The anesthesiologists and the surgeon develop relationships like Dr. Shaw had with many surgeons at Baptist that was effectively destroyed when he was excluded from practicing at Baptist. Another point I want to address is that Ms. Johnson says, well, who's harmed by these claims? And Ms. Johnson asserts that we have to show harm to patients in order to state an antitrust claim. That is absolutely not true. The party that's harmed and the proper plaintiff to challenge an exclusive dealing agreement is the competitor that's excluded from the market. And that is exactly what Dr. Shaw is. Dr. Shaw is an excluded competitor from the market. He shows antitrust injury and absolutely is the proper plaintiff to challenge the Baptist's exclusive agreement. I would note that with respect to the geographic market, Appley's challenged the methodology that Dr. Shaw used to define it, but they failed to explain or even contend that the geographic market should be broader. In closing, this court should reverse the district court's decision again because the district court fundamentally misconstrued Dr. Shaw's claims. It erroneously refused to consider critical evidence of market-wide harm to competition and it improperly resolved disputed issues of fact on which Dr. Shaw presented substantial evidence. Thank you. Thank you. That will conclude today's arguments. The court will be recessed until nine o'clock in the morning. Thank you.